**STATE**

v.

**Vincent MANNING.**

**No. 2007–19–C.A.**

Supreme Court of Rhode Island.

June 26, 2009.

---

Lauren S. Zurier, Department of Attorney General, for Plaintiff.

Paula Rosin, Office of Public Defender, for Defendant.

Present: GOLDBERG, Acting C.J., and FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (Ret.).

## OPINION

Justice SUTTELL, for the Court.

The defendant, Vincent Manning, appeals from a judgment of conviction on one count of first-degree child molestation. The defendant's sole issue on appeal is whether the trial justice erroneously barred defense counsel from inquiring into the alleged victim's prior allegation of sexual abuse during cross-examination. The defendant seeks reversal of his conviction and a new trial. For the reasons set forth below, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

This case arises from an incident on the night of January 8, 2000, in which Sandy,[1] the complaining witness, accused defendant of molesting her. Sandy, aged twelve at the time, and her older sister, Mandy, had gone over to their "aunt" Barbara Rapko's house for a sleepover.[2] Ms. Rapko's niece and nephew, Beth and Kevin, and her infant godson, David, were also staying at her house that night. The defendant, Ms. Rapko's boyfriend at the time, also was present on the night of January 8, 2000. At the time of the incident, defendant and Ms. Rapko had been dating for approximately five years and, although they did not live together, he frequently spent the night at her house.

Sandy testified that she arrived at Ms. Rapko's house at approximately 6 p.m. and got dressed for bed in new pajamas that she recently had received as a Christmas gift. Ms. Rapko did Sandy's hair, an activity Sandy enjoyed, and then all the children settled down into the living room to watch a movie. There were two couches in the living room; defendant sat down on the large couch and Sandy occupied the smaller couch or "love seat." The other children watching the movie sat on the floor.

Sandy testified that Ms. Rapko went upstairs with David soon after the movie started. As the movie went on, Beth and Kevin both got into their sleeping bags. Mandy lay down on the floor under a blanket. At some point during the course of the movie, Sandy also moved to the floor because she said the couch was too hot and was bothering her back. She got inside a sleeping bag in between Beth and Kevin, and at some point she fell asleep. Mandy, also on the floor, was positioned closest to defendant, with the other three children farther away.

Sandy testified that she was awakened by "somebody touching me." She said defendant had placed his finger inside her vagina and was making circular motions.[3]

---

1. We use fictitious names to identify the complaining witness and other children.

2. Although both girls referred to Ms. Rapko as "Aunt Barbara," they were not, in fact, related.

3. The prosecution did not elicit any testimony regarding the positioning of both Sandy and Mr. Manning during the alleged molestation; but, after drawing out from Sandy on cross-examination a statement that she had been

She testified that "[i]t hurt and it burned" and lasted a few minutes before defendant stopped and went upstairs.[4] Sandy stated that she remained quiet during the abuse because she was scared. She noticed that the time on the clock read 2:45 a.m.

Sandy testified that, a few minutes later, she tried to call her older cousin but was unable to reach her. Next, she attempted to contact her mother, but again no one answered. Failing to reach anyone, Sandy said that she changed out of her pajamas in the upstairs bathroom to prepare to leave.[5] It was at that time that she noticed a hole in the crotch of her pajama bottoms that did not exist when she went to bed. Despite preparing to leave, she went back downstairs where she lay on the couch and fell back to sleep. On cross-examination, Sandy revealed that she also attempted to wake up Mandy once she went downstairs by "push[ing] her a couple of times" and saying "wake up," but was unable to arouse her because she "sleeps in a deep sleep."

The following morning, Sandy called her mother's boyfriend, Calvin Beatty, and asked him to pick her up. Mr. Beatty asked whether he could wait until Mandy was also awake so that he could pick them up at the same time, but Sandy insisted on being taken home immediately. Mr. Beatty characterized Sandy as sounding frightened, and noted that she was standing outside of Ms. Rapko's house when he arrived approximately ten minutes later. Upon arriving home, Sandy disclosed the alleged abuse. Sandy's mother called Ms. Rapko right away and demanded that Mandy be removed from her house. Sandy's mother also called the police, who interviewed Sandy at the police station. Subsequently, she was examined at Hasbro Children's Hospital, on January 10, 2000, to determine whether there was any physical evidence of the alleged abuse.

That initial examination could not confirm Sandy's allegation, but the examining physician sought a second opinion. Ten days later, Carole Jenny, M.D., director of the Child Protection Program at Hasbro Children's Hospital, conducted an examination of Sandy. Again, the examination could not confirm that Sandy had been abused, but Dr. Jenny cautioned during her testimony that "[a] normal [examination] neither rules out [n]or confirms that type of abuse. This child was well on into her adolescent development. * * * Given digital penetration, I wouldn't expect to see any permanent scars or changes from that type of contact."

sleeping on her right side and that Mr. Manning had reached his arm underneath her to molest her, defense counsel confronted her with her grand jury testimony in which she stated that she was lying on her left side and that Mr. Manning came "from the back of me, under."

4. When pressed on cross-examination, Sandy stated that the molestation lasted approximately fifteen minutes.

5. There is conflicting testimony about whether there also is a downstairs bathroom in Ms. Rapko's house. Sandy offered detailed testimony about a bathroom with "just a toilet" on the first floor. On cross-examination, defense counsel questioned Sandy why she chose to change in the upstairs bathroom which was significantly closer to the man she alleged had just molested her. Sandy responded that she did not change downstairs because "I wasn't going to change in front of a big window where everybody could see." Ms. Rapko and defendant both testified that she had only one bathroom, located upstairs. Ms. Rapko also stated that Sandy did not change out of her pajamas until the next morning when she showered and got dressed before being picked up. The trial justice noted that he did not find Sandy's testimony regarding the downstairs bathroom to be credible, when he considered the defense's motion for a new trial.

Mr. Manning testified on his own behalf, and strenuously denied molesting Sandy. He said that he fell asleep during the movie and went upstairs around 12 a.m. or 1 a.m. upon awakening. He testified that all the children were asleep when he went upstairs. Ms. Rapko testified on behalf of defendant and corroborated that he came to bed around 1 a.m. She also said that defendant was asleep in their bed at 2:30 a.m., when she woke up to take medication.

Before commencement of the jury trial, defendant filed a notice of intent to introduce evidence of a prior unsubstantiated allegation of molestation allegedly made by Sandy against her godfather, arguing that it was admissible under *State v. Oliveira*, 576 A.2d 111 (R.I.1990) to challenge Sandy's credibility. During discovery, the prosecution had produced the Rhode Island Hospital Child Safe—Child Protection Clinic Evaluation, from Sandy's January 10, 2000 examination, which notes that Sandy has "a history of being sexually molested by her godfather" and that she had been evaluated by the Child Safe Clinic in April 1997.[6] Additionally, the state had produced a psychiatric assessment performed by Northern Rhode Island Community Services in May 2002, which recounts that Sandy was molested by her godfather when she was eight years old, but adds that "charges were dropped." In response to defendant's notice, the state filed a motion *in limine* seeking to preclude defendant from "eliciting from [Sandy] testimony regarding [the] unresolved allegation." The state argued that

eliciting such testimony would confuse and mislead the jury and was too remote in time to be relevant.

At the pretrial hearing on the state's motion *in limine*, defendant made the following offer of proof:

"during the course of discovery in this case, and earlier at a violation hearing, evidence was provided, those being medical records and consultations, which were produced in the course of treatment of the complaining witness, that made reference to prior accusations or prior alleged molestations by a certain Walter * * * occurring sometime in or about 1997.

"Apparently, no criminal charges ever resulted. It is unclear whether the complaining witness in this case or her family, ever notified law enforcement, but apparently she did make these accusations.

"We are looking to inquire regarding those accusations at trial from this witness.

"This witness, apparently, if memory serves, is now fifteen years old or so. At the time of the initial allegation, she would have been about eight to ten years old. What I'm talking to is the allegations regarding Walter * * *, as the same."

He then argued such evidence was admissible under *Oliveira*.

The state countered that under *Oliveira* and *State v. Dorsey*, 783 A.2d 947, 950 (R.I.2001), the admissibility of prior allegations of molestation falls within the sound

6. The document also states "She was actually evaluated in the Child Safe Clinic in April of '97 for these allegations. At that time, DCYF and the Woonsocket Police were involved in that investigation. * * * Also of note in regards to the previous allegations of sexual abuse by [Sandy's] godfather Walter, mom states that [Sandy] has had no contact with

Walter since the allegations were brought forth. Reportedly[,] in April of 1997, [Sandy] had reported that it had occurred approximately 1 1/2 to 2 years ago. At that time, she was noted to have a normal physical exam, which neither ruled out nor confirmed the possibility of sexual abuse."

discretion of a trial justice. It then contended that in this case the evidence would be extremely prejudicial to the complaining witness, and it would serve only to confuse the jury. Conceding that the previous accusation was similar to the current charge against Mr. Manning, the state argued that both the witness's "tender age" when she made the first accusation and the remoteness in time weighed in favor of precluding the evidence.

At the conclusion of the hearing, the trial justice declined to make a contemporaneous ruling, stating:

"At this time, I'm going to deny the State's Motion in Limine but reserve judgment as to whether or not the examination by counsel for the defendant goes beyond the defendant's right under the Sixth Amendment to cross-examine her and whether or not the testimony would even be cumulative.

"I will deny the Motion in Limine filed by the State. After the young lady testifies, assuming she does testify, then, [defense counsel], you can be heard in the absence of the jury, as to whether or not an examination as to the subject matter to which you have referred, would be appropriate.

" * * *

"That way, both sides will have sufficient opportunity to argue whether or not it's probative, whether or not it's cumulative, whether or not it's prejudicial, whether or not it's in violation of Rule 403, but I'm not restricting the defendant at this time.

"I'll make a decision at the appropriate time after she testifies on direct examination."

Sandy was the first witness for the prosecution. After she completed her direct testimony, defense counsel, in the course of his cross-examination, asked, "You've made accusations against men for molesting you in the past, haven't you?" The prosecution immediately objected and, after a sidebar discussion, the trial justice sustained the prosecution's objection.[7]

---

**7.** The trial transcript reveals the following conversation:

"[DEFENSE COUNSEL]: [Sandy will] testify she's made accusations before, and that she's not aware of any conviction entering therefrom. And also, Judge, it also goes to the point that if you have a 12– or 13–year old girl, who's the alleged subject of molestation, the fact she's made accusations of this in the past, can lead one to believe she has some familiarity with the terminology or the nature of the proceedings.

"THE COURT: That's not an issue here.

"[PROSECUTOR]: No.

" * * *

"THE COURT: But again, I still don't understand what basis do you have to ask the question? Do you know she made some complaints in the past.

"[DEFENSE COUNSEL]: The basis I have—

"THE COURT: Yes.

"[DEFENSE COUNSEL]:—she made an accusation, I guess Walter * * *, who was her godfather.

"THE COURT: She lived there—

"[DEFENSE COUNSEL]: Yeah, in 1997. I mean, I'll limit it to that one. I can limit the question.

" * * *

"THE COURT: So your question is: Did she ever make a complaint against someone else by the name of Walter. If she says 'no'—

"[DEFENSE COUNSEL]: I'd bring Walter in to rebut it.

"THE COURT: You may not be able to rebut it. It may be collateral.

"[DEFENSE COUNSEL]: Well, in the hospital records, I think you're going to introduce, are you?

"[PROSECUTOR]: No.

"[DEFENSE COUNSEL]: It is in the hospital records. I can ask the doctor, I can question the doctor about that.

"[PROSECUTOR]: So you're going to introduce hearsay.

The defense made a final effort to introduce the past allegation through cross-examination of Sandy's mother, arguing both that "this incident could be a fabrication, or could be another false allegation and goes to her credibility" and alternatively "[t]o the extent the [s]tate would contend she's not likely to fabricate it because of her age, these type of allegations, but if she made the allegations before, she's familiar with not just the knowledge as to how to make an allegation." Again, the trial justice sustained the state's objection to this line of inquiry, finding it to be remote and irrelevant.

On February 3, 2003, the jury returned a guilty verdict on the sole charge of first-degree child molestation. The Superior Court denied defendant's motion for a new trial on February 13, 2003. In his ruling from the bench, the trial justice acknowledged that he was troubled by some inconsistencies in Sandy's testimony and that the motion for new trial turned, essentially, on Sandy's credibility. Because he concluded that reasonable minds could differ in their evaluation of the evidence, he declined to overturn the jury verdict. The trial justice subsequently sentenced defendant to twenty-five years incarceration, with thirteen years to serve and the remainder to be suspended, with probation.[8] The defendant timely appealed.

## II

### Standard of Review

■ "It is well settled that this Court will not disturb a trial justice's ruling on an evidentiary issue unless that ruling 'constitutes an abuse of the justice's discretion that prejudices the complaining party.'" *State v. Hallenbeck,* 878 A.2d 992, 1015 (R.I.2005) (quoting *State v. Gomez,* 848 A.2d 221, 232 (R.I.2004)). "Although a criminal defendant has a constitutional right to cross-examine prosecution witnesses, 'this right is far from absolute.'" *State v. Merida,* 960 A.2d 228, 234 (R.I. 2008) (quoting *State v. Lopez,* 943 A.2d 1035, 1042 (R.I.2008)). "Further, this right is 'tempered by the dictates of practicality and judicial economy'; trial justices are authorized to exercise sound discretion in limiting the scope of cross-examination." *Id.* (quoting *State v. Ramirez,* 936 A.2d 1254, 1261 (R.I.2007)).

## III

### Discussion

### A

### Right of Cross–Examination: General Principles

■ "Both the Sixth Amendment to the United States Constitution (through the Fourteenth Amendment) and article 1, section 10, of the Rhode Island Constitution guarantee individuals accused of criminal charges the right to confront and cross-examine any adverse witnesses who testify against them." *Dorsey,* 783 A.2d at 950; *see Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Cross-examination affords the accused a critical vehicle for testing the credibility and veracity of a witness's testimony. *See*

"[DEFENSE COUNSEL]: It's not hearsay if it's from her.

"[PROSECUTOR]: It's not through the doctor.

"THE COURT: It could qualify as a business record exception, too, from the hospital. But that's not the issue. I'm concerned now about the ability to cross-

examine her now about complaints she made three years earlier against Walter. I'm going to sustain the State's objection."

8. Mr. Manning was already serving time for an unrelated felony domestic-assault conviction and the trial justice ordered the sentences to run consecutively.

*Davis,* 415 U.S. at 316, 94 S.Ct. 1105; *State v. Doctor,* 690 A.2d 321, 327 (R.I. 1997) (guaranteeing criminal defendant's right to effective cross-examination). Indeed, the United States Supreme Court "has recognized that cross-examination is the 'greatest legal engine ever invented for the discovery of truth.'" *Kentucky v. Stincer,* 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quoting *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) and 5 Wigmore, *Evidence* § 1367 at 29 (3d ed.1940)).

■ This right may be constrained, however, "within reasonable parameters of relevance in the exercise of the trial justice's discretion." *Dorsey,* 783 A.2d at 950; *State v. Bowden,* 473 A.2d 275, 279 (R.I. 1984); *see Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"); *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("[T]he right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."). Once there has been "sufficient cross-examination to satisfy a defendant's constitutional confrontation rights," the trial justice may exercise his sound discretion in limiting further cross-examination. *State v. Brown,* 709 A.2d 465, 473 (R.I. 1998). Yet we are also mindful that:

"Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop." *State v. DeBarros,* 441 A.2d 549, 551 (R.I.1982) (quoting *Alford v. United States,* 282 U.S. 687, 691–92, 51 S.Ct. 218, 75 L.Ed. 624 (1931)).

■■ Our rules of evidence generally treat with disfavor the use of evidence of a witness's prior conduct "for the purpose of proving that he or she acted in conformity therewith." R.I. R. Evid. 404(a). However, Rule 608(b) of the Rhode Island Rules of Evidence allows for cross-examination, at the discretion of the trial justice, of a witness's prior similar false accusations, if probative of truthfulness or untruthfulness.[9] Ordinarily, the cross-examiner is bound by the answers of the witness and may not introduce extrinsic evidence to prove or disprove the witness's testimony on cross-examination. Rule 608(b); *see Merida,* 960 A.2d at 234–35 n. 14. Although the Supreme Court held in *Davis,* 415 U.S. at 316–18, 94 S.Ct. 1105 that a criminal defendant has a constitutional right to cross-examine witnesses to expose

---

9. Rule 608(b) of the Rhode Island Rules of Evidence provides:

"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, or, in the discretion of the trial judge, evidence of prior similar false accusations, may not be proved by extrinsic evidence.

They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

bias, pattern, or motive to lie, it has not affirmatively extended the right of confrontation to cross-examination intended to show that the witness has lied in the past and thus may have a propensity to lie. *See Davis*, 415 U.S. at 321, 94 S.Ct. 1105 (Stewart, J., concurring) ("I would emphasize that the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination"); *see also Redmond v. Kingston*, 240 F.3d 590, 593 (7th Cir.2001) (distinguishing the use of prior false allegations to show a motive to lie from the use of such evidence to demonstrate that the complaining witness "has lied in the past to show that she is lying now[,] * * * [which] may be outweighed by the prejudicial effect of revealing that the witness had made such a serious charge falsely."); *Quinn v. Haynes*, 234 F.3d 837, 845 (4th Cir.2000), *cert. denied*, 532 U.S. 1024, 121 S.Ct. 1968, 149 L.Ed.2d 762 (2001) ("The distinction between impeachment evidence proving bias and impeachment of general credibility is important because generally applicable evidentiary rules limit inquiry into specific instances of conduct through the use of extrinsic evidence and through cross-examination with respect to general credibility attacks, * * * but no such limit applies to credibility attacks based upon motive or bias."); *Hogan v. Hanks*, 97 F.3d 189, 191 (7th Cir.1996) ("although the Supreme Court has frequently held that states must permit cross-examination that will undermine a witness's testimony, * * * it has never held—or even suggested—that the longstanding rules restricting the use of specific instances and extrinsic evidence to impeach a witness's credibility pose constitutional problems"); *United States v. Bartlett*, 856 F.2d 1071, 1088, 1089 (8th Cir.1988) (noting "[a]dmission of all evidence that is the least bit probative of credibility is not * * * always constitu-

tionally required" and concluding that the trial court did not err in excluding evidence of an alleged prior false rape accusation solely to attack the witness's general credibility); *Hughes v. Raines*, 641 F.2d 790, 793 (9th Cir.1981) (upholding trial judge's preclusion of cross-examination concerning witness's prior false allegation as reasonable exercise of discretion and noting the Supreme Court's distinction between impeaching for general credibility and impeaching for bias, motive, or prejudice); *Merida*, 960 A.2d at 234–35 (noting that Rule 608 is limited to impeachment of the general credibility of a witness and does not pertain to impeachment for motive or bias). As these cases instruct, cross-examination concerning prior accusations to challenge a witness's general credibility is not always constitutionally required.

## B

### Right of Cross–Examination: Sexual Abuse Cases

Nevertheless, we have long applied special evidentiary rules to prior accusations of sexual assault when used to challenge the complaining witness's credibility. *See State v. McCarthy*, 446 A.2d 1034, 1034–35 (R.I.1982) (reversing trial justice's exclusion of evidence that complaining witness had withdrawn rape charges against a different man). In *Oliveira*, 576 A.2d at 113, we held that the complaining witness's prior allegations of abuse were admissible even if those prior allegations had not been proven false or withdrawn. We said:

"We believe that evidence of a complaining witness' prior allegations of sexual assault may be admitted 'to challenge effectively the complaining witness's credibility,' even if the allegations were not proven false or withdrawn. * * * We have often stated that the

credibility of a witness is always in issue. The defendant's inability to prove that prior accusations were in fact false does not make the fact that prior accusations were made irrelevant. By not allowing defendant the opportunity to challenge [the witness's] credibility, the trial justice inappropriately infringed on defendant's Sixth Amendment rights of confrontation and effective cross-examination." *Id.* (requiring cross-examination and admission of DCYF records of alleged victim's prior unproven but never recanted sexual abuse allegations against different men).

We have invoked this language in a number of our subsequent opinions. *See State v. Dennis,* 893 A.2d 250, 266 (R.I.2006) (complainant's prior claim of rape that she previously admitted was a lie was admissible to challenge that witness's credibility); *Dorsey,* 783 A.2d at 951, 952 (trial justice did not err by excluding evidence of an accusation the victim had made twenty years earlier but restating that "evidence of a complaining witness's similar accusations of wrongdoing against others may be used to challenge a witness's credibility with respect to the pending charges, regardless of whether those prior accusations ever were proved false"); *State v. Pettiway,* 657 A.2d 161, 163 (R.I.1995) (restating *Oliveira* holding). *But see State v. West,* 95 Hawai'i 452, 24 P.3d 648, 655 (2001) ("nearly every jurisdiction addressing this question has consistently required a preliminary determination of falsity prior to the admission of allegedly false statements of unrelated sexual assaults"). Moreover, we indicated in *Oliveira* that such evidence also may be admitted to demonstrate that the alleged victim had another source of knowledge about the sexual acts described by the victim as having occurred during the assault. *Oliveira,* 576 A.2d at 113–14 (quoting *State v. Jacques,* 558 A.2d 706, 708 (Me.1989)

(criminal defendants "must be permitted to rebut the inference a jury might otherwise draw that the victim was so naive sexually that she could not have fabricated the charge")).

In subsequent decisions we have elaborated a more nuanced doctrine concerning cross-examination that has limited the broadest reading of our decision in *Oliveira.* In *State v. Botelho,* 753 A.2d 343, 347 (R.I.2000), we held that the trial justice properly precluded cross-examination concerning the witness's prior allegations of sexual abuse against other men when there was insufficient evidence to show the witness had actually alleged the abuse. We noted that the witness vigorously denied making the allegations during *voir dire* and that defense counsel was unable to produce evidence corroborating that she had actually made the allegation. *Id.* at 346. Furthermore, in *State v. Lynch,* 854 A.2d 1022, 1035 (R.I.2004), we stated that evidence of prior accusations of sexual abuse that result in conviction "had no relevance with respect to [the witness's] credibility" as the conviction "conclusively establish[ed] the truthfulness of her accusations." In *Pettiway,* 657 A.2d at 163–64, we held that the defendant had a constitutional right to cross-examine the complaining witness regarding prior sexual abuse allegations that showed a pattern of accusing her mother's boyfriends. Significantly, we recognized that the United States Supreme Court has particularly emphasized "that a cross-examiner should be afforded ample opportunity to develop the issues of bias, prejudice, and motivation properly before the jury" and declined to simply rely on *Oliveira's* general credibility analysis. *Id.* at 163 (citing *Davis,* 415 U.S. at 318, 94 S.Ct. 1105). Moreover, a trial justice maintains discretion under Rule 403 of the Rhode Island Rules of Evidence to preclude cross-examination when its pro-

bative value is substantially outweighed by the danger of confusion of the issues, the possibility of misleading the jury, or is needlessly cumulative. *See Lynch*, 854 A.2d at 1035–36 (upholding denial of cross-examination regarding prior allegation resulting in conviction where trial justice had allowed cross-examination about two other "strikingly similar" allegations); *Dorsey*, 783 A.2d at 953 ("Given the dissimilarity of this incident to those at issue during defendant's trial, the trial justice was entitled to consider the jury's potential confusion, the victim's tender age when the charge was made and when the underlying event supposedly occurred and the remoteness in time of this prior charge as weighing against its admission into evidence.").

## C

### Analysis

■ With these principles in mind, we turn now to the circumstances surrounding the trial justice's preclusion of cross-examination of Sandy concerning her purported accusation of previous sexual molestation by her godfather. The issue first arose when defendant filed a "notice of intent to offer prior sexual history of complaining witness" and the state filed a motion *in limine* seeking to exclude such evidence. The notice clearly reflected defendant's intent to use Sandy's "prior sexual history" to attack her credibility, rather than to expose any bias, pattern, or motive. At the pretrial-motion hearing, defendant offered only that medical records referred to accusations of molestation that Sandy "apparently" had made approximately six years earlier. The trial justice denied the state's motion but invited counsel to argue, after Sandy had testified, whether such a line of inquiry would have probative value,

or whether it would be cumulative or unfairly prejudicial. The issue resurfaced during trial when the state objected to the following question asked of Sandy during her cross-examination: "You've made accusations against men for molesting you in the past, haven't you?" After a sidebar conference the trial justice sustained the state's objection.

We are of the opinion that the trial justice did not abuse his discretion in preventing defendant from cross-examining Sandy with regard to her purported previous accusation of molestation against her godfather.[10] Significantly, defendant never argued that the purported prior accusation was relevant to expose any bias, prejudice, or pattern on her behalf. In *Pettiway*, 657 A.2d at 163, 164, we emphasized the "Supreme Court's pronouncement that a cross-examiner should be afforded ample opportunity to develop the issues of bias, prejudice, and motivation properly before the jury," in holding that, "the defense was denied the opportunity to cross-examine [the complaining witness] fully for the purpose of presenting to the jury its theory that [she] had a pattern of accusing her mother's boyfriends of sexually assaulting her." *See Davis*, 415 U.S. at 318, 94 S.Ct. 1105. In the case under review, defendant sought to introduce the prior accusation to undermine Sandy's general credibility, and not as evidence of her motive, possible bias, or to demonstrate that she had a pattern of alleging sexual assault.

The defendant offered alternative theories in support of allowing inquiry into Sandy's purported prior allegation, neither of which persuade us that the trial justice abused his discretion in sustaining the state's objection. At the sidebar conference, defendant first argued that Sandy

---

**10.** We note that defendant never even suggested that Sandy had accused any other man of molestation, as implied in his question to her on the witness stand.

would testify that she had made accusations before "and that she's not aware of any conviction entering therefrom." Even assuming that Sandy had accused her godfather of molestation, a fact that we do not believe had been clearly established at the pretrial hearing, we are satisfied the trial justice did not err by precluding the proposed line of inquiry. The defendant's sole purpose in pursuing this subject was to challenge Sandy's general credibility. In essence, he sought to demonstrate to the jury that she had lied in the past, and thus may be lying again. While as one court has noted, "[t]he use of evidence that a person has lied in the past to show that she is lying now is questionable * * * since very few people, other than the occasional saint, go through life without ever lying, unless they are under oath," *Redmond*, 240 F.3d at 593, we have long viewed evidence of prior false sexual-abuse allegations in the context of a sexual-abuse prosecution as probative of a defendant's guilt or innocence.

As a matter of general credibility, in contrast to issues of bias, pattern, or motive, however, the probative value of Sandy's purported prior accusation is directly proportional to the degree of certainty that the prior accusation was false. Further, the probative value of such evidence may be outweighed by its prejudicial effect or capacity to confuse or mislead the jury, all of which are considerations properly committed to the trial justice's discretion.

Although *Oliveira* does not require a defendant to prove the falsity of a prior accusation, unless there is a minimal showing that the prior accusation was, in fact, false, its probative value is slight. As we stated in *Lynch*, 854 A.2d at 1035, a prior true allegation is irrelevant because it is not probative of the witness's character for truthfulness. *See also Dorsey*, 783 A.2d at 953 (emphasizing negligible relevance of purported prior rape allegation when the defendant offered no indication of its falsity).[11] Even though under our case law a defendant need not prove the falsity of the prior accusation, he must at least present some indicia tending to show that the prior accusation was false, or else he runs the risk of a determination that its probative value is outweighed by its prejudicial effect.

Here, defendant made no effort to demonstrate the falsity of Sandy's prior accusation other than a third-hand statement that "no criminal charges ever resulted." We cannot view the state's apparent decision not to prosecute as evidence that the allegation was false. *See Commonwealth v. Costa*, 69 Mass.App.Ct. 823, 872 N.E.2d 750, 756 (2007), *cert. denied, Commonwealth v. Costa*, 450 Mass. 1101, 875 N.E.2d 862 (2007) ("The victim's mere failure to prosecute or confirm prior allegations of sexual assault, or the Commonwealth's decision not to move forward with criminal charges, are insufficient bases for inferring that the allegations in question are false."). The fact that the state did not undertake a criminal prosecution could mean nothing more than that the attorney general decided he lacked sufficient evidence to obtain a conviction. *See Hughes*, 641 F.2d at 792.

In the case at bar, a review of the sidebar colloquy shows that the trial justice obviously was concerned with the basis

---

11. Indeed, permitting inquiry into a true or unresolved prior sexual-abuse allegation would undermine the purpose of the rape shield statute to "encourage victims to report crimes without fear of inviting unnecessary probing into the victim's sexual history." *State v. Lynch*, 854 A.2d 1022, 1035 (R.I.2004) (quoting *State v. Dorsey*, 783 A.2d 947, 954 (R.I.2001)).

for the question defendant had posed to Sandy. The trial justice asked defense counsel, "Do you know she made some complaints in the past?" Counsel then replied, "She made an accusation, I guess Walter [ ], who was her godfather." In light of this vague and unsubstantiated proffer and the representations made by defendant at the pretrial hearing, we cannot fault the trial justice for attaching little probative significance to defendant's proposed subject of cross-examination. After providing defendant the opportunity to explain how such a line of questioning would shed light on Sandy's general credibility, he exercised his broad discretion in precluding the proposed cross-examination. We perceive no facts that the trial justice overlooked tending to show that Sandy's purported prior allegation against her godfather was false and, therefore, we cannot say the trial justice abused his discretion by precluding cross-examination.

■ The defendant's second rationale for allowing him to cross-examine Sandy on her purported prior accusation was that she was so naive sexually that the jury would infer her only source of knowledge could come from the alleged abuse by defendant. The trial justice summarily dispatched this suggestion, tersely stating, "[t]hat's not an issue here[,]" to which defendant offered no response. We agree with the trial justice. It is evident from the record that Sandy was visibly pregnant at the time of trial. The jury was surely aware that Sandy had other sources of knowledge of sexual terminology and, therefore, there was no need to rebut any assumption of sexual naivete. Accordingly, the trial justice was acting well within his discretion when he precluded the cross-examination of Sandy based upon this theory.

We are asked to reverse the trial justice's evidentiary ruling without knowing what if anything, Sandy herself alleged or the veracity of that purported allegation. Indeed, the sole basis of defendant's requested line of inquiry consisted of two hearsay reports that fail to even indicate the identity of the declarant. Furthermore, defendant failed to demonstrate that the probative value of the excluded evidence was anything more than minimal. Thus, we perceive no facts upon which to make such a judgment and, accordingly, hold that the trial justice did not abuse his discretion in precluding cross-examination regarding Sandy's purported prior accusation of sexual molestation. We are also of the opinion that a *voir dire* examination of Sandy could have easily illuminated the probative value of defendant's suggested line of questioning. Such questioning would have, at the very least, revealed whether Sandy, in fact, made such an allegation, and whether she maintained the truthfulness of that allegation, both crucial aspects of its probative value. Notwithstanding the prosecutor's concession that the allegation was "similar," the trial justice was left to exercise his discretion within a dearth of information. Without a persuasive rationale for the probative value of allowing this line of questioning to impeach Sandy's general credibility, the trial justice properly considered the possible prejudicial effects of allowing an inquiry into a "collateral" matter. The trial justice articulated remoteness and irrelevancy as his reasons for precluding such cross-examination. We are satisfied that his ruling was an appropriate exercise of his broad discretion under the Rhode Island Rules of Evidence.

■ Moreover, defense counsel was afforded ample opportunity to cross-examine Sandy sufficient to satisfy the defendant's constitutional right of confrontation. He was able to expose a multitude of inconsistencies in Sandy's recollection of the al-

leged abuse, so much so that the trial justice acknowledged that he was "troubled" by various aspects of her testimony. Defense counsel was so effective in undermining Sandy's explanation for why she changed in the upstairs bathroom that the trial court labeled her testimony about the existence of a downstairs bathroom "a falsehood." That the jury, in performing its solemn obligation of weighing the credibility of the witnesses, decided that Sandy was telling the truth is no indication that the defendant was denied the opportunity to test her credibility in the "crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court and remand the record of the case thereto.